UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALBONA LUCAJ and
SEBASTIANO QUAGLIATA,

                    Petitioners,                    No. 09-CV-14716-DT

vs.                                                 Hon. Gerald E. Rosen

MICK DEDVUKAJ, Detroit District,
Director, United States Citizenship and
Immigration Services, et al.,

                    Respondents.
_____/

OPINION AND ORDER REGARDING
DEFENDANTS' MOTION TO DISMISS

                    At a session of said Court, held in
                    the U.S. Courthouse, Detroit, Michigan
                    on _____September 21, 2010_____

                    PRESENT:   Honorable Gerald E. Rosen
                               United States District Chief Judge

I. INTRODUCTION

        Petitioners Valbona Lucaj and her husband, Sebastiano Quagliata, filed the instant

"Petition for Hearing on Naturalization Application Under 8 U.S.C. § 1447(b)," seeking a

declaratory judgment to award them naturalization because Respondents failed to make a

determination on their applications for citizenship within 120 days of their naturalization

examinations.  Defendants responded to Plaintiffs' petition by way of a Fed. R. Civ. P.

1

12(b)(1) motion to dismiss this action as moot.  Petitioners filed a response opposing

Defendants' Motion and Defendants replied.  At the Court's direction, on June 29, 2010,

Plaintiffs and Defendants submitted supplemental briefs.

Having reviewed the parties' briefs, the accompanying exhibits, and the record as

a whole, the Court finds that the pertinent facts and legal contentions are sufficiently

presented in these materials, and that oral argument would not assist in the resolution of

this matter.  Accordingly, the Court will decide the motion "on the briefs." *See* Eastern

District of Michigan Local Rule 7.1(f)(2). This Opinion and Order sets forth the Court's

rulings.

## II.  FACTUAL BACKGROUND

This case, involving a husband and wife's 14-year attempt to obtain United States

citizenship, has a protracted and confusing administrative history.   In December 1996,

Sebastiano Quagliata, a native of Italy, entered the United States.   A few weeks later, in

January 1997, his wife, Valbona Lucaj, a native of Albania, followed.  In April 1997,

Valbona Lucaj filed an application for asylum with the United States Citizenship and

Immigration Service ("USCIS") claiming persecution on account of her religion.  Her

husband also applied for asylum status as a derivative applicant. The couple was

interviewed for asylum status on May 6, 1997.  Government documents in the record

reveal that the interviewing officer found their testimony for asylum to not be credible.

Notwithstanding the interviewing officer's credibility assessment, however, on June 17,

1997, both Valbona and her husband were granted asylum by the USCIS's New York

Asylum Office, under the direction of Supervisory Asylum Officer John Shandorf.[1]

Based on this grant of asylum, a year later Lucaj and Quagliata applied for lawful

permanent resident ("LPR") status, as permitted by 8 U.S.C. §1159(b).  At some point

during the pendency of Plaintiffs' LPR application, it appears that the Government

became aware that Valbona Lucaj's asylum status had been fraudulently procured.

According to the record, in 2003, the Plaintiffs applied for a waiver for grounds of

excludability.  [Def.'s Supp. Br. Ex. F at 6].   Such a waiver is used when an alien has

been declared inadmissible and hence ineligible for adjustment of their status from asylee

to a LPR.   "Any alien who, by **fraud** or willfully misrepresenting a material fact, seeks to

procure (or has sought to procure or has procured) a visa, other documentation, or

---

[1] The interviewing officer found discrepancies in the statements of Valbona Lucaj.
[Def.'s Supp. Br., Ex. D p. 1.]  A subsequent investigation found that John Shandorf, the
Asylum Officer Supervisor, had accepted bribes in exchange for granting asylum
applications.  In later proceedings a "notario", Luigi Berishaj, pled guilty to paying bribes
to Shandorf in exchange for granting the asylum applications of his Albanian friends.
Berishaj subsequently testified against Shandorf, who was later convicted.  An FBI report
stated: "From in or about mid-1996 until September, 1997 [Luigi] Berishaj made cash
payments to Shandorf in connection with approximately twenty cases. Each time Berishaj
paid Shandorf between $1,500 and $2,000. In exchange for these payments, Shandorf
agreed to provide assistance in securing political asylum for these individuals."  *Stolaj v.
Holder*, 577 F. 3d 651, 653 (6th Cir. 2009).  Valbona Lucaj's asylum application was
identified as one of the cases involved in Shandorf's bribery/fraud scheme.  [*See* Def's.
Supp. Br., Ex. L.]

The Court notes that Plaintiffs themselves have not been charged with or convicted
of a crime.

admission into the United States or other benefit provided under this Act is

inadmissible." 8 U.S.C. §1182(a)(6)(C)(i). However, the statute provides a provision for

waiver. 8 U.S.C. §1182(a)(6)(C)(iii).[2] The applications for LPR status were approved in

April 2003 and made retroactive to April 2002.

On August 5, 2005, two years after becoming lawful permanent residents,

Plaintiffs received a "Notice of Intent to Terminate Asylum Status" ("NOIT") from the

Department of Homeland Security (DHS).[3] [Def.'s Mot. Ex. B at 2 and Def.'s Supp. Br.

---

[2] The record shows an "Application by Refugee for Waiver of Grounds of Excludibility" for the use of fraudulent documents in obtaining entry to the United States. It was signed and dated by the Plaintiff Lucaj on February 13, 2003. [Defendant's Supplemental Brief Ex. F at 6]. Though there is no indication that any Government official ever granted the waiver, it is doubtful that LPR status could have been granted to Lucaj and Quagliata without it.

[3] 8 C.F.R. § 208.24(a)(1) provides,

> An asylum officer may terminate a grant of asylum made under the jurisdiction of an asylum officer or a district director if following an interview, the asylum officer determines that there is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted.

8 C.F.R. § 208.24(c) provides,

> Prior to the termination of a grant of asylum or withholding of deportation or removal, the alien shall be given notice of intent to terminate, with the reason thereof, at least 30 days prior to the interview specified in the paragraph (a) of this section before an asylum officer. The alien shall be provided the opportunity to present evidence showing that he or she is still eligible for asylum or withholding of deportation or removal. If the asylum officer determines that the alien is no longer eligible for asylum or withholding of deportation or removal, the alien shall be given written notice that asylum status or withholding of deportation or removal and any

4

Ex. H at 1].  The NOIT notified Plaintiffs:

> Our office has obtained evidence that indicates fraud in your application for asylum such that you were not eligible for asylum at the time it was granted.  In May 2000, Supervisory Asylum Officer John Shandorf was convicted in United States District Court in the Eastern District of New York of bribery and conspiracy in his handling of asylum cases.  In that investigation, the individual who claims to have prepared your application for asylum indicated that he used a portion of the money he received from you to pay Mr. Shandorf to assure a positive outcome on your asylum application.  This individual has also stated that he prepared fraudulent asylum applications and encouraged applicants to fabricate elements of their claims.  In addition, there is evidence in your case that Mr. Shandorf was, in fact, involved in the processing of your asylum application by the New York Asylum Office."

*Id.*

The NOIT also provided Plaintiffs 30-days notice to appear for an interview to respond to the adverse information.  The interview was conducted on September 7, 2005.  At this point, the record is silent on the outcome of the interview.  This silence continues, with the Plaintiffs hearing nothing from the government regarding the intent to terminate their asylum status for the next four years.

While the issue of the termination of their asylum status was still unresolved, on May 5, 2007, Plaintiffs filed applications for naturalization.  They were both interviewed on their naturalization applications in April 2008.  A decision on Plaintiff Quagliata's application was withheld pending receipt of the administrative file which was in the Chicago Asylum Office.  [Def.'s Supp. Br. Ex. M at 2].  On August 7, 2008, Plaintiff

---

employment authorization issued pursuant hereto, are terminated.

Lucaj's application for naturalization was "recommended for approval" but no final

decision was made. [4]

On July 15, 2009, a full six years after the Plaintiffs were granted LPR status and

nearly four years after having been served with notice of intent to terminate their asylum

status, the Government served Plaintiffs with a "Notice of Termination of Asylum,"

which terminated the asylum of Valbona Lucaj and Sebastiano Quagliata. [Def.'s Mot.

Ex. B at 2]. In this notice, the government listed the reasons for its decision, including

inconsistencies in the September 2005 interview and fraud in the procurement of asylum

status. [Pl.'s Supp. Br. Ex. C at 1]. On the same date, a USCIS asylum officer created an

internal memo which stated, "The files are being forwarded to the Detroit District Office

for revocation of both individuals' LPR status and placement into removal proceedings

thereafter based on the finding of fraud and resulting termination of their status in the

United States." [Def.'s Supp. Br. Ex. L at 1]. The record is not clear whether Plaintiffs

were made aware of the planned removal proceedings at that time.

Seemingly undeterred by what they did know – that their asylum status had been

terminated – Plaintiffs eagerly anticipated a decision regarding their naturalization

applications that were originally filed in May 2007. Counsel for the Plaintiffs contacted

USCIS on October 14, 2009, about "the delay" and allegedly was told Plaintiffs would

---

[4] On April 2, 2008, Lucaj failed the history and government portions on her first attempt
and her interview was rescheduled for August 7, 2008. She passed on her second attempt.
Quagliata passed his exams on April 2, 2008.

have a response in 30 days.  [Pl.'s Mot. at line 18].

### III.  PROCEDURAL POSTURE OF THIS CASE

On December 3, 2009, after not receiving a response regarding their applications for naturalization, Plaintiffs brought this suit under 8 U.S.C. §1447(b) complaining about the length of time that their naturalization applications had been pending with the USCIS. They asked that this Court make a determination on their naturalization applications and declare that they are entitled to be naturalized as United States citizens.

It was during the pendency of this action, on February 8, 2010, that the USCIS finally made a decision denying Plaintiffs naturalization, citing lack of good moral character arising out of the Plaintiffs' commission of fraud in obtaining asylum as the basis for its denial.  [Def.'s Mot. pg. 2].[5]  Shortly thereafter, on February 22, 2010, the Government responded to the Plaintiffs' petition with the instant Fed. R. Civ. P. 12(b)(1) Motion to Dismiss on the Basis of Mootness.  Plaintiffs responded arguing that once they

_____

[5]  In its decision, the USCIS stated:

> As a result of the review of the entire filed, USCIS has concluded that you failed to establish that you are[] individual[s] of good moral character because you obtained your asylum through fraud.  Additionally, because your asylum was obtained through fraud you cannot establish that your previous admission as a permanent resident was lawfully obtained or was made in accordance with all applicable provisions of the law.  Accordingly, your application[s] for Naturalization [are] denied.  This decision is made without prejudice toward the filing of a new application should you meet the above requirements.

[Def's Mot. Ex. B.]

filed their petition, exclusive jurisdiction was vested with the Court and the USCIS was no longer authorized to make any decision on the naturalization application unless and until the Court remanded the matter back to the Agency. Defendants countered that jurisdiction was not exclusive, but rather is concurrent, and that the Agency still retained the authority to adjudicate the matter once the lawsuit was filed with the District Court.

Upon request of the Court, both parties subsequently submitted supplemental briefs on June 29, 2010, detailing the facts surrounding the Notice of Intent to Terminate Asylum and Termination of Asylum. The Court's primary objective was to ascertain whether removal proceedings had commenced. The commencement of removal proceedings is relevant to this Court's ability to establish whether it had subject matter jurisdiction over this action as "jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document [i.e., a Notice to Appear] is filed with the Immigration Court by the Immigration Service." 8 C.F.R. § 1003.14(a). Presumably prompted by the inquiry from this Court, the Government took action to commence removal proceedings by serving Plaintiffs with a "Notice to Appear" on June 28, 2010, more than six months after this case was filed and three weeks after the Court's Order for Supplemental Briefing. [*See* Def's Supp. Br. Ex. P at 1].[6]

---

[6] 8 C.F.R. § 1239.1 provides, "Every removal proceeding conducted under section 240 of the Act [8 U.S.C. §1229(a)] to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the immigration court."

The salient issue presented by Defendants' motion is whether the District Court has exclusive or concurrent jurisdiction upon the filing of a § 1447(b) petition, and whether events subsequent to the filing of this suit - i.e., the USCIS's denial of an application for naturalization and initiation of removal proceedings - - have stripped this Court of its statutory jurisdiction.

There are obviously many other issues surrounding this case that go to the merits of the USCIS's decisions to deny naturalization and institute removal proceedings. However, the Court need not address those issues at this time as they are not essential to the determination of this case. More importantly, a district court is prevented from deciding the merits of a denial of naturalization until administrative remedies have been exhausted and a timely judicial appeal is filed. Only after the plaintiff's application has been denied both by the USCIS and the Immigration Judge, does a federal court have jurisdiction to review de novo the facts surrounding the denial of naturalization. 8 U.S.C. §1421(c).[7]


IV. <u>ANALYSIS</u>

A.     <u>OVERVIEW OF IMMIGRATION LAW DEVELOPMENTS</u>

Before turning to the issues presented by Defendants' motion, the Court finds it

---

[7] Judicial review of removal proceedings is permissible via an appeal to the Court of Appeals after a timely appeal from a Board of Immigration Appeals decision has been filed.

instructive to provide a brief overview of several key developments in immigration law which are relevant to the matter at hand. At one point in our nation's immigration law history, the acts of naturalization and removal were housed under two different branches of government: the Judiciary had responsibility for naturalization and the Attorney General (Executive branch) had responsibility for removal. *Zayed v. United States*, 368 F.3d 902, 905 (6th Cir. 2004).

With the Immigration Act of 1990, dual-branch responsibility for naturalization and removal ended and Congress placed "sole authority to naturalize persons as citizens of the United States" on the "Attorney General." See Immigration Act of 1990, Pub. L. No. 101-649. District courts retained authority to review naturalization applications in two scenarios:

(1) If the USCIS denies an application for naturalization, the district courts may review the denial de novo after administrative remedies (a hearing before an Immigration Judge) have been exhausted. INA § 310(c), 8 U.S.C. § 1421(c), or

(2) If the USCIS has not made a decision granting or denying an application for naturalization within 120-days, the district court may either determine the matter or remand the matter to the agency, with appropriate instructions. INA § 336(b), U.S.C. § 1447(b).

Following the terrorist attacks on September 11, 2001, an important structural change regarding immigration took place: the Immigration and Naturalization Service ("INS"), headed by the Attorney General was abolished and replaced with the

Department of Homeland Security ("DHS"), headed by the Secretary of DHS.[8] *See* Homeland Security Act of 2002, Pub L. 107-296.

The Act impacted immigration through creating three agencies within DHS that deal with immigration issues: 1) the Bureau of Citizenship and Immigration Services ("USCIS") which administers immigration benefits including processing citizenship applications, asylum requests; 2) the Bureau of Immigration and Customs Enforcement ("ICE") responsible for detention and removal, and 3) the Bureau of Customs and Border Protection ("CBP") which oversees ports, borders and inspection of aliens entering the United States. A separate agency, the Executive Office For Immigration Review ("EOIR"), within the Department of Justice, administers immigration courts where removal proceedings occur.[9]

B.      STANDARD OF REVIEW

As indicated, Defendants' Motion to Dismiss presents a question concerning the Court's subject matter jurisdiction. When faced with a question of subject matter jurisdiction, the Court must address those issues before all others. *Gross v. Hougland*, 712 F.2d 1034 (6th Cir. 1983). There are two categories of motions to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) -- facial attacks and factual

---

[8] INS is used interchangeably with DHS/USCIS in cases and statutes dated after 2002 throughout this opinion.

[10] Disposition of this case only requires discussion of USCIS and EOIR. There will be no further discussion of the other agencies.

attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  A facial attack challenges the court's subject matter jurisdiction based upon the sufficiency of the pleadings.  In considering a "facial attack," a court will consider the material allegations of fact set forth in the complaint as being true and construe them in a light most favorable to the nonmoving party.  *United States v. Ritchie*, 15 F.3d at 598; *Cooley v. United States*, 791 F. Supp. 1294 (E.D. Tenn. 1992); *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).  The Government has not argued that there are any jurisdictional facts in dispute.  Accordingly, the Court will treat the Government's motion to dismiss as presenting a facial attack on the Court's jurisdiction.

Even if Congress has provided subject matter jurisdiction by statute, if a plaintiff's claims are moot, the Court also lacks jurisdiction to decide the case.  *WJW-TV, Inc. v. City of Cleveland*, 878 F.2d 906, 909 (6th Cir. 1989).  "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979).  When determining subject matter jurisdiction, the court must assume that the plaintiff's allegations are true and draw all inferences in a light most favorable to him.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).  Dismissal is only appropriate if it is apparent there is an absence of subject matter jurisdiction or the case is moot.  *See Ritchie*, 15 F.3d at 598.

C.      THE EFFECT OF THE USCIS'S DENIAL OF NATURALIZATION

After Plaintiffs filed this suit requesting that the Court adjudicate their applications for naturalization pursuant to § 1447(b), the USCIS denied their applications citing lack of good moral character.  The USCIS, therefore, requests the suit be dismissed for lack of subject-matter jurisdiction on the basis of mootness, specifically arguing that the Agency retained jurisdiction to adjudicate Plaintiffs' naturalization applications after their suit had been filed with the Court.  Furthermore, the USCIS argues that the Plaintiffs' claim is moot because there is no longer a "case or controversy," given that it has denied the applications for naturalization.

The Court begins its analysis with the statutory text of § 1447(b) which provides:

> If there is a failure to make a determination [on an application for naturalization] under section 1446 of this title before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

8 U.S.C. § 1447(b).

The intent of Congress in enacting this law was to minimize the delays applicants experience in applying for citizenship.  See H.R. Rep. No 101-87, at 8 (1989); 135 Cong. Rec. H4539-02, H4542 (1989) (statement of Rep. Morrison).  If the USCIS (the "Agency") has not made a decision on an application within 120-days after the examination has taken place, aliens have a statutory right to take their case to the district court.  Upon the party filing a petition, pursuant to the statute, the district court may take

13

one of two courses of action: 1) the court may determine the matter by either granting or denying the application for citizenship, or 2) the court may remand the matter to the Service for adjudication, with instructions.

Neither party disputes this Court had subject matter jurisdiction when the petition was filed. This case, unlike many § 1447(b) cases that have been before this and other courts in this district, is not one which concerns whether the word "examination" in the statute refers to a discrete event or a process, or when the clock for 120-days begins to toll. Rather, this case involves whether, once a petition has been filed with the court, the Agency nevertheless retains the authority to make a determination. In other words, is jurisdiction exclusive to the court or concurrent between the court and the Agency? The Government asserts jurisdiction is concurrent and, as such, the Agency retains the power to grant or deny a naturalization application even after the district court has assumed jurisdiction over it. Plaintiffs contend otherwise.

Though finding it unnecessary to address the issue, the Sixth Circuit observed in *Rahman v. Napolitano*, 2010 WL 2777271 (6th Cir., July 13, 2010), that at least three other circuits -- the Second, Fourth and Ninth -- have held that once an action is properly filed under §1447(b), the district court's jurisdiction is exclusive and the USCIS -- having had the statutory 120-day period to decide the question -- is stripped of jurisdiction. *Id.,* 2010 WL 2777271 at *4 (citing *United States v. Hovsepian*, 359 F.3d 1144, 1159 (9th Cir. 2004) (en banc); *Etape v. Chertoff*, 497 F.3d 379, 385, 388 (4th Cir.2007)

(abrogating *Kia v. INS*, 175 F.3d 1014 (4th Cir. 1999) (Table)) and *Bustamante v. Napolitano*, 582 F.3d 403, 405 (2d Cir. 2009)).  *See also Al-Maleki v. Holder*, 558 F.3d 1200, 1205 n. 2 (10th Cir. 2009) (declining to answer the question, but noting the persuasive reasoning of *Hovsepian* and *Etape* ).  In addition to the circuits mentioned above, the majority of district courts have concluded that jurisdiction of the district court is exclusive once a judicial action is  filed.  *See e.g., Elaasar v. Mueller*, 522 F. Supp. 2d 932, 936 (N.D. Ohio 2007); *see also Al-Mohammed v. U.S.C.I.S.*, 2007 WL 2004866 at 3 (E.D. Mich. 2007) (Duggan, J.).

The Government argues that because the statute does not specifically use the word "exclusive" in describing jurisdiction, exclusive jurisdiction was not intended and, therefore, jurisdiction must be concurrent.  The court in *United States v. Hovsepian, supra*, specifically addressed this point when it held it would be impossible for the court to "determine the matter" where the INS, too, has the authority to "determine the matter":

> How can the court "determine the matter" if the INS has the option to "determine the matter," too, and essentially force the court to accept its view? This wording shows that Congress intended to vest power to decide languishing naturalization applications in the district court *alone*, *unless* the court chooses to "remand the matter" to the INS, with *the court's* instructions.

*Hovsepian*, 359 F.3d at 1160 (emphasis in original).

The court further held a "remand," which is the second option available to courts pursuant to statute, can only occur when a lower court (in this case an agency) has lost jurisdiction:

§1447(b) allows the district court… to "remand the matter"… . When we "remand" a case to the district court, for example, we do so because the district court has lost jurisdiction once we acquire it upon the filing of a proper notice of appeal. The most natural reading of the statute is that Congress used the term "remand" in the same sense.

*Id.*

This Court agrees with those courts that have decided that the district court's jurisdiction is exclusive and with both points made by the *Hovsepian* court. *Hovsepian* is particularly persuasive because, like this case, *Hovsepian* involved a plaintiff who filed a § 1447(b) petition and shortly thereafter, the USCIS denied his application for naturalization. The Ninth circuit, sitting en banc, held that the district court's jurisdiction was exclusive and the Agency did not have the power to deny the application once the § 1447(b) petition was filed with the court.

In a similar case, *Bustamante v. Napolitano*, 582 F. 3d 403 (2nd Cir. 2009), the petitioner filed a § 1447(b) lawsuit and the USCIS subsequently denied his application citing lack of good moral character. The Second Circuit reversed the district court's decision granting the Government's motion to dismiss the case on the basis of mootness, and held that only the district court has jurisdiction to determine a naturalization application when, after USCIS has failed to adjudicate the application within 120 days of the initial examination, the applicant files a § 1447(b) action. *Id.* at 403.

The Government argues that "simply because the language of §1447(b) provides that a district court *may* determine the matter, does not necessarily mean that USCIS may

not." [Def.'s Reply Br. at 3]. The Court finds this argument unpersuasive as the Government's construction of the statute ignores the statutory context of the word "may". The statute states that if no determination is made by the USCIS within 120 days after the date of the citizenship examination, a naturalization applicant may apply to the district court for a hearing on the matter, and "[s]uch court has jurisdiction over the matter and *may* either determine the matter or remand the matter, with appropriate instructions to the Service to determine the matter." 8 U.S.C. § 1447(b).

The sentence in which "may" appears states unequivocally that the court has jurisdiction. The subsequent clause containing the word "may" is actually further illustrative of exclusive jurisdiction: "may" is immediately followed by the word "either." Here, "may" is the auxiliary verb and "either" serves as a the conjunction linking the verb clauses 'determine the matter', and 'remand the matter.' Thus, it is the action that the court may take that is permissive in this context; not the court's jurisdiction.

Furthermore, concurrent jurisdiction would be counter to Congressional intent. Though the Government states exclusive jurisdiction leads to a waste of time and resources, the fact is that this case, and all situations arising from § 1447(b) petitions, arise only as a result of delay on the part of the Government. The Government, then, is in the best position to prevent any "waste of time and resources" by adjudicating applications for naturalization within the 120-day time frame established by Congress.

The consequence of the USCIS's failure to meet that timeline necessarily means that the district court acquires exclusive jurisdiction over the matter (upon the applicant's request), and retains that jurisdiction until the district court either decides the case or exercises its discretion to remand the matter to the INS. *Hovsepian*, 359 F.3d at 1161.

The Court further concurs with the view of the court in *Bustamante*, that the vesting of exclusive jurisdiction with the district court does not mean USCIS is barred from continuing its consideration of the naturalization application or from reaching a "tentative determination." The *Bustamante* court held:

> USCIS may continue to work on the application while the matter is pending before the court and may even reach a tentative decision. We do not suggest that upon the applicant's invocation of a district court's § 1447 (b) jurisdiction, [the] USCIS is barred from continuing its consideration of the naturalization application or reaching a *tentative* determination.

*Bustamante*, 582 F. 3d at 408 (emphasis added).

Certain practical realities might support such agency action and it prevents the agency from wasting time. However, the court is not bound by any decisions the agency makes in the absence of jurisdiction. *Elaasar*, 522 F. Supp. 2d at 936.

D.    THE EFFECT OF INITIATION OF REMOVAL PROCEEDINGS

In addition to denying the application for naturalization after the Plaintiffs filed a § 1447(b) petition with this Court, the USCIS also instituted removal proceedings. Although the USCIS has not directly argued that initiation of removal proceedings affects this Court's jurisdiction, the USCIS makes much of the fact that initiation of removal

proceedings prevents this Court from granting Plaintiffs' petition for naturalization. In this context, the Court must view this argument as an indirect, or back- door, attack on subject matter jurisdiction.

Analyzing the effect of agency action in this context requires a brief discussion of the historical context of removal proceedings. Prior to 1950, when both the judiciary and the Attorney General had responsibility for removal, there was not a law giving priority to one proceeding over the other. As a result, there was often a 'race-to-the-courthouse'. The Supreme Court described this occurrence and its legislative solution in *Shomberg v. United States*, 348 U.S. 540 (1995): "…[T]here ensued a race between the alien to gain citizenship and the Attorney General to deport him. If the alien was successful in forcing a final hearing and the granting of his naturalization petition, the deportation proceedings were completely nullified." *Id.* at 543. To remedy this situation, the Congress incorporated § 27 in the Subversive Activities Control Act of 1950, 64 Stat. 1015, 8 U. S. C. (1946 ed., Supp. V) § 729 (c)." *Id.* at 544.

The Subversive Activities Control Act of 1950 provided that:

No person shall be naturalized against whom there is outstanding a final finding of deportability, and no petition for naturalization shall be finally heard by a *naturalization court* if there is pending against the petitioner a deportation pursuant to a warrant or arrest issued under the provisions of this or any other Act….

*Ajlani v. Chertoff*, 545 F.3d 229, 235 (2d Cir. 2008) (emphasis added).

From 1950 until 1990 district courts were prohibited from ruling on a

naturalization application while removal proceedings were pending, in effect prioritizing removal proceedings over naturalization proceedings. *Id.* As a result, in the Immigration Act of 1990, which provided the Attorney General with "sole authority to naturalize persons as citizens," the wording of the statute was changed to reflect the role of the Attorney General versus that of the naturalization (district) courts. The Act, codified at 8 U.S.C. §1429(b), was amended, and today reads:

> No person shall be *naturalized* against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest issued under the provisions of this chapter or any other Act; and no application for naturalization shall be considered by the *Attorney General* if there is pending against the applicant a removal proceeding pursuant to a warrant of arrest issued under the provisions of this chapter or any other Act.

*Id.* (emphasis added).

Close inspection of this statute reveals an emphasis on "pending" proceedings ("…no application for naturalization shall be considered…if there is a *pending… removal proceeding.…*"). Congress has plainly indicated that the adjudication of naturalization applications should cease when orders of removal are issued prior to a §1447(b) petition. A removal proceeding does not "commence" against an alien until the INS files the Notice to Appear with the Immigration Court. Logically, a removal proceeding cannot be "pending" before it has "commenced."

The Court now turns its attention to whether or not removal proceedings were properly pending before Plaintiff's §1447(b) petition was filed. It is undisputed that Plaintiffs' asylum was terminated prior to them petitioning this Court. The termination of

asylum is an important triggering event that can lead to removal proceedings. 8 C.F.R. §

208.24(e) states, "When an alien's asylum status…is terminated under this section, the

Service shall initiate removal proceedings, as appropriate…"[10]

Though the INS had the authority and opportunity to commence removal

proceedings immediately upon the termination of Plaintiffs' asylum status, Defendants

conceded in their June 29th supplemental submission to this Court:

> "It is true that *plaintiffs are not currently in removal proceedings*.
> Generally, a Notice to Appear (NTA) is issued simultaneously with the
> decision to terminate asylum. Although that was not done in this case, a
> memorandum to file…states that the plaintiffs are to be placed into removal
> proceedings. . . . In any event, USCIS has recently issued NTAs for both
> plaintiffs and forwarded them to ICE. Once ICE files the NTAs with the
> Immigration Court, plaintiffs will be considered in removal proceedings."

Def.'s Supp. Br. at 9. (emphasis added).[11]

After years of delay, the Agency initiated the removal proceeding by filing the

---

[10] As a result of the termination of asylum, the Government asserts Plaintiffs then became
ineligible for naturalization as they could no longer establish they were "lawfully
admitted into the United States for permanent residence in accordance with all applicable
provisions of the Immigration and Nationality Act, 8 U.S.C. §1427." [Def.'s Supp. Br. at
9]. Plaintiffs, on the other hand, assert they are eligible for naturalization because the
Government left their LPR status undisturbed and as lawful permanent residents, they
remain eligible for naturalization. This Court need not reach this question. It goes to the
ultimate merits of the decision to deny naturalization. It is impermissible for this Court to
decide that matter given this is not an appeal based on the denial of an application for
naturalization [pursuant to §1421(c)] where there is a de novo review, but a §1447(b)
petition facing challenges to subject-matter jurisdiction.

[11] Plaintiffs were served with the NTAs on June 28, 2010, the day before the
Government filed its Supplemental Brief.

Notice to Appear *more than six months after this case was filed*.  As the *Hovsepian* court

held, "The INS's intentions are irrelevant…   Regardless of the reasons for failing to file

the charging papers, the fact remains that no removal proceedings were 'pending' against

[petitioners] when the district court naturalized them.  Thus, § 1429 did not bar the

district court from considering their naturalization applications."  *Hovsepian v. United*

*States*, 359 F. 3d. at 1165.  In this case, because the Plaintiffs were not in removal

proceedings prior to filing their complaint, the Court retains jurisdiction is not barred by

§1429.

Despite this, the Government's position that the initiation of removal proceedings

prevents the district court from naturalizing the petitioner, however, is correct.  In *Zayed*

*v. United States*, 368 F.3d 902 (6th Cir. 2004), plaintiffs filed an appeal of a denial of

naturalization (§1421(c)).  The Court of Appeals held that the district could not properly

order the Attorney General to grant the petitioner's application for naturalization pursuant

to §1429(b).  However, it is important to note that the *Zayed* court reversed the district

court's decision concluding that it did not have *jurisdiction* to review naturalization

applications because of the pending removal proceedings.  "The effect of §1429, in our

view, is to limit the scope of the court's review and circumscribe the availability of

effective remedies, but not to oust the district court of jurisdiction." *Id.* at 906. Though

this case specifically addressed the denial of applications for naturalization, given that

§1421(c) and §1447 are the only two instances where district courts may review

naturalization applications, it can be assumed that a similar reasoning to a §1447 petition applies.  Removal proceedings instituted after a petition has been filed limits a court's effective remedies, but does not divest the court of jurisdiction.

E.    USCIS'S ACTIONS SUBSEQUENT TO PLAINTIFFS' FILING §1447(B)
      PETITIONS DOES NOT MOOT THE CASE

Claims for mootness rest on the assumption that the USCIS retained jurisdiction. As set forth above, the USCIS did not retain jurisdiction upon the filing of the § 1447(b) petition; upon the filing of the petition, jurisdiction vested exclusively with the Court. The Court had jurisdiction at the onset of litigation because the Plaintiffs were not in removal proceedings prior to their initiation of this lawsuit, and the USCIS's subsequent commencement of removal proceedings cannot, and does not, divest this Court of its jurisdiction.

The burden of establishing mootness is a heavy one. If there still exists a "case or controversy," the burden to establish mootness has not been met.  *County of Los Angeles v. Davis*, 440 U.S. 625.  In § 1447(b) cases in which a motion to dismiss on the basis of mootness has been granted, it has been because the plaintiff gained the sought after relief -- his application for naturalization was approved.  *See Kochary v. DHS*, 2009 WL 211045 at 2 (M.D. Tenn. 2009).  Here, the Plaintiffs have not received the sought after relief.  Therefore their claim cannot be moot.

As indicated, at the time of the USCIS's decision to deny naturalization and institute removal proceedings, this Court had exclusive jurisdiction which prevented the

USCIS from acting on the petition until the Court had remanded the case back to the Agency. However, that leaves the question of how to proceed. Though fully acknowledging its authority under § 1447(b), this Court has often cited the "ordinary remand rule" stating: "[C]ourts should defer to agencies that bear the statutory obligation to make the initial determination on particular matters within their presumed expertise and delegated authority. *See Khelifa v. Chertoff*, 433 F. Supp.2d 836, 844-845 (E.D. Mich. 2007).

Here, remand is the appropriate procedural course of action because of the particular circumstances of the case. The USCIS made two decisions based on information gleaned during its investigation. Such actions taken by the USCIS prior to this decision must be viewed as tentative. In the event the USCIS maintains its decision to deny naturalization and institute removal proceedings, those actions may occur only after this decision, while Plaintiffs retain their right to seek administrative review pursuant to 8 U.S.C. § 1447(a) which, according to the record, is still pending.[12] If the administrative procedure is unsuccessful, Plaintiffs may their seek *de novo* judicial review pursuant to 8 U.S.C. § 1421(c).

<u>CONCLUSION</u>

For the reasons set forth above, the Court will deny Defendants' motion to dismiss

───────────────

[12]  According to Defendants, Plaintiff filed an administrative appeal of the USCIS's decision denying their naturalization applications pursuant to 8 C.F.R. § 1447(a) and 8 C.F.R. § 336.2. [*See* Def.'s Supp. Br. at 4.]

for lack of subject-matter jurisdiction on the basis of mootness.   Accordingly,

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss on the Basis of

Mootness **[Dkt. # 11]**is DENIED.

IT IS FURTHER ORDERED that this case be, and hereby is, REMANDED to the

U.S. Citizenship and Naturalization Service for proper adjudication of Plaintiffs'

applications for naturalization.


                                   s/Gerald E. Rosen_____
                                   Chief Judge, United States District Court

Dated:  September 21, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 21, 2010, by electronic and/or ordinary mail.

                                   s/Ruth A. Gunther_____
                                   Case Manager